IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND


QNX SOFTWARE SYSTEMS            *
GmbH & Co. KG,
                               *

        Plaintiff,             *

            v.                 *           Civil Action No. RDB 09-2206
                               *
NETRINO, LLC,
                               *
        Defendant.

*      *      *      *      *      *      *      *      *      *      *      *      *

<u>**MEMORANDUM OPINION**</u>

        Plaintiff QNX Software Systems GmbH & Co. KG ("Plaintiff" or "QNX") brings this

action against Defendant Netrino, LLC ("Defendant" or "Netrino") for trademark infringement

and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114 & 1125, and under Maryland

law.  Both parties have moved for summary judgment.  Plaintiff QNX has moved to strike

certain portions of the declarations of Netrino's attorney and president.  The parties' submissions

have been reviewed and no hearing is necessary.  *See* Local Rule 105.6 (D. Md. 2010).  For the

reasons that follow, Plaintiff QNX's Motion to Strike (ECF No. 53) is DENIED, QNX's Motion

for Summary Judgment (ECF No. 38) is DENIED, and Defendant Netrino's Cross Motion for

Summary Judgment (ECF No. 47) is DENIED.

**FACTUAL BACKGROUND**

**A.      Plaintiff QNX**

        Plaintiff QNX is a prominent embedded software systems supplier that licenses and

distributes software and provides related services under the mark "Neutrino" in Canada, the

United States and throughout the world.  QNX Summ. J. Mem., Decl. of Jennifer Camelon

1

("Camelon Decl.") ¶¶ 2, 5-6.  QNX's "Neutrino"-branded embedded software products and related services are sold to customers in a variety of industries, including industrial, telecommunications, automotive, medical, military security and aerospace.  *Id.* ¶ 10.  Over the last thirteen years, QNX has made "tens of millions" of dollars in sales from the embedded software and related services it sells under the mark "Neutrino."  *Id.* ¶¶ 7, 8.  During this time, QNX has also spent millions of dollars advertising these products and services in magazines, trade shows and on the Internet.  *Id.* ¶ 8.

On May 24, 1995, QNX applied to the U.S. Patent and Trademark Office ("Trademark Office") for a trademark for its "Neutrino" mark.[1]  *Id.* Ex. 1; Netrino Summ. J. Mem. Decl. of Edward A. Pennington ("Pennington Decl.") Ex. 19.  On May 27, 1997, the Trademark Office issued a trademark for the name "Neutrino" for "operating system software and manuals relating thereto sold as a unit."[2]  Camelon Decl. Ex. 1 (U.S. Trademark Registration No. 2,065,648).  The trademark registration states that QNX first began using the mark "Neutrino" in October 1995, and that "Neutrino" was first used in commerce on January 7, 1997.  *Id.*; Pennington Decl. Ex. 14.

**B.      Defendant Netrino**

Defendant Netrino offers training, consulting and development services for embedded software engineers under the mark "Netrino."  QNX's Summ. J. Mem., Decl. of John Dabney

---

[1] Approximately two months earlier, on March 20, 1995, QNX filed for a trademark for its "Neutrino" mark in Canada.  Camelon Decl. Ex. 1; Canada Application No. 777,553.  Under Section 44(d) of the Lanham Act, 15 U.S.C. § 1126(d) (2010), QNX could claim priority for use of the "Neutrino" mark in the United States as of this date if it filed an application to register the mark with the Trademark Office within the next six months.  Thus, because QNX timely filed for a trademark under Section 44(d), it can claim March 20, 1995 as its foreign priority date.

[2] It appears that the two year gap between QNX's trademark application and the trademark issuance is the result of the lengthy registration process that filing under Section 44(d) entails.

("Dabney Decl.") Ex. 2. Netrino offers its embedded software services to consumers in the following industries: industrial controls, medical devices, communications systems and the military and aerospace. *Id*. Ex. 5. Netrino advertises its services through the internet, direct email advertisements and booths at trade shows. *Id*. Ex. 6. Unlike QNX, Defendant's advertising expenditures on its "Netrino"-branded services have thus far been minimal. *Id*. Nonetheless, sales of Defendant's "Netrino"-branded training, consulting and development services for embedded software have been growing in the last few years, and amount to approximately $9 million over the last ten years. *Id*.

Netrino was incorporated in January 1999 by Michael Barr ("Barr"), its president and sole shareholder. Answer ¶ 2. According to Defendant's later trademark application, the "Netrino" mark was first used in commerce on January 25, 1999. Pennington Decl. Exs. 12 & 13. However, Barr states that he came up with the name "Netrino" about three years earlier, in 1996, and that he felt the name "conjured the image of a little network." Netrino Summ. J. Mem., Decl. of Michael Barr ("Barr Decl.") ¶ 3. Though Barr asserts that he did his own trademark search for the word "Netrino" before naming his company, he did not obtain a legal opinion about the availability of this name before formally adopting it in 1999. Dabney Decl. Exs. 3, 12.

### C. QNX Asks Netrino to Cease and Desist Using its Mark

On March 3, 1999, shortly after Netrino was incorporated by Michael Barr, QNX sent its first cease and desist letter to Defendant alleging that Netrino's corporate name and website infringed upon QNX's trademark for Neutrino and demanding that Defendant abandon all use of the word "Netrino." Pennington Decl. Ex. 4. Though Barr was aware of QNX as a company, he

asserts that this was the first time he became aware of QNX's use of the word "Neutrino" in conjunction with its products and services, as well as the first time he had heard of QNX's "Neutrino Real Time Operating System (RTOS)" product. *Id.* Ex. 5; Barr Decl. at ¶ 13. Netrino responded to QNX's letter on March 19, 1999, highlighting the differences it perceived between the "Netrino" and "Neutrino" marks, denying any likelihood of confusion, and informing QNX that Netrino did not and would not manufacture any products that would compete with QNX's Neutrino RTOS product. Pennington Decl. Ex. 6.

On June 15, 1999, QNX wrote to Netrino a second time, repeating that it considered Defendant's use of the mark "Netrino" to be trademark infringement and demanding that Defendant cease all use of the "Netrino" name. *Id.* Ex. 7. On September 2, 1999, QNX sent yet another letter to Netrino with similar content, but added a demand that Defendant transfer its domain name, www.Netrino.com, to QNX. *Id.* Ex. 8. On October 18, 1999, Netrino replied to QNX's letters, reiterating its position that QNX's accusations were "baseless," and that Netrino did not manufacture or sell any products that would compete with QNX's "Neutrino"-branded product. *Id.* Nonetheless, Netrino offered to settle the matter by relinquishing its rights to the word "Netrino" and transferring the domain name to QNX for a one-time payment of $4,500. *Id.* QNX never responded to this letter or to the settlement offer. *Id.* Ex. 10; Barr Decl. at ¶ 13.

**D.      Defendant Trademarks "Netrino"**

On April 9, 2003, Netrino filed an application with the Trademark Office for its stylized "Netrino" logo. Pennington Decl. Ex. 12. On July 13, 2004, the Trademark Office issued Netrino a trademark for its logo for the "design and development of computer hardware and software." *Id.* (U.S. Trademark Reg. No. 2,862,712). Four years later, on May 17, 2007,

Netrino submitted an application with the Trademark Office for a standard character mark for the word "Netrino."[3] *Id*. Ex. 13. Notably, the Trademark Office's Examining Attorney did not cite QNX's mark as likely to cause confusion. *Id*. Ex. 15. On September 18, 2008, QNX filed a Letter of Protest with the Trademark Office, objecting to Defendant's application on the basis that the "Netrino" mark was "likely to cause confusion, dilution, mistake and/or deception...." *Id*. On December 2, 2008, the Trademark Office rejected QNX's protest, concluding that "the marks and the goods and service as set forth in the application and registration differ to such an extent that examination of the mark presented in the application without consideration of the issue presented in the Letter of Protest is not considered to be clear error." *Id*. Ex. 16. On January 7, 2009, QNX filed a Notice of Opposition with the Trademark Trial and Appeal Board. *Id*. On February 4, 2009, the Board denied QNX's opposition for procedural reasons, namely because QNX's attorney at that time, Beverly Shin, was erroneously listed as the opposer instead of QNX. *Id*. Ex. 17. On March 3, 2009, the Trademark Office issued Netrino a standard character trademark for the "design of computer hardware, integrated circuits, communications hardware and software and computer networks for others. *Id*. Ex. 13 (U.S. Trademark Registration Number 3,582,135).

During this time, Netrino developed a new stylized logo. On September 15, 2008, Defendant filed an additional application to trademark its new logo. Pennington Decl. Ex. 18. On February 24, 2009, QNX filed another Notice of Opposition with the Trademark Trial and Appeal Board. *Id*. Ex. 19. Netrino responded on April 4, 2009, but after multiple joint requests for extensions, QNX's Opposition was suspended in light of the present action. *Id*. Ex. 20.

---

[3] "Standard character" marks are registered "without claim to any particular font style, size, or color." 37 C.F.R. § 2.52(a).

On August 21, 2009, QNX filed this action against Netrino for trademark infringement and unfair competition under the Lanham Act, 15 U.S.C. §§ 1114 & 1125, and under Maryland law. As relief, QNX seeks a permanent injunction enjoining Netrino from using its mark and all others similar to QNX's "Neutrino" mark and requests an order requiring Defendant to surrender or requiring the Trademark Office to cancel Netrino's federal trademark registrations for its mark. On August 5, 2010, QNX moved for summary judgment. ECF No. 38. On August 24, 2010, Netrino also moved for summary judgment. ECF No. 47. On September 13, 2010, QNX moved to strike portions of evidence Netrino submitted in support of its cross motion for summary judgment. ECF No. 54.

## MOTION TO STRIKE

In conjunction with examining the substance of the parties' dispute, this Court initially addresses QNX's Motion to Strike. QNX argues that Netrino relies on inadmissible evidence contained in the declarations of its attorney, Edward Pennington (ECF No. 47-2), and its president, Michael Barr (ECF No. 47-5), and moves to strike portions of each.

### A.     Pennington Declaration

QNX contends that Pennington's statements that third parties applied for and received trademarks for marks containing the word "Neutrino," and the third-party trademark applications and registrations it attaches in support of these statements, should be stricken because Netrino did not produce these documents during discovery. QNX Mot. to Strike 2-4; Pennington Decl. ¶¶ 33-34, Exs. 31 & 32. QNX asserts that because it did not receive these exhibits during discovery it was "deprived of the opportunity to conduct discovery to address Defendant's argument concerning alleged third-party use." QNX Mot. to Strike 3. In response, Netrino

contends that these applications and registrations are all publicly available. Netrino also asserts that if it is at fault for providing these documents after the close of discovery, then QNX is at fault for similar conduct, as QNX also disclosed records of third-party trademark registrations after the close of discovery.

Though Netrino should have disclosed the documents at issue in a timely manner, QNX has not been unfairly surprised by Netrino's late production of the third-party trademark registrations and applications. Notably, QNX was on notice that one of the many factors this Court must consider in trademark infringement cases is the strength of a trademark. This analysis includes consideration of how often a mark's text is used in conjunction with other goods and services. *See, e.g.*, *Pizzeria Uno Corp. v. Temple*, 747 F.2d 1522, 1527 (4th Cir. 1984). Furthermore, these trademark applications and registrations were equally available to both parties. Thus, QNX has not been unfairly prejudiced by this presentation of evidence of trademarked names that are identical or similar to QNX's "Neutrino" mark.

## B.    Barr Declaration

QNX asserts that portions of statements made in Barr's declaration should be stricken because they do not meet the requirements of Federal Rule of Civil Procedure 56(e), which requires that all evidentiary material offered in support of or in opposition to a summary judgment motion "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated."

First, QNX takes issue with Barr's use of the phrase "It is my understanding . . ." before making certain statements. Specifically, QNX objects to the following statements in Barr's declaration:

- "It is my understanding based on my experience in the industry as well as the record in this case, that when QNX sells services they do so under the QNX company name rather than the Neutrino product name."  Barr Decl. ¶ 23.

- "It is my understanding and belief that QNX's service sales are always in support of or as a follow-on to the sale of its product."  *Id*.

QNX contends Barr's use of the phrase "my understanding" shows that Barr lacks personal knowledge to support the assertions at issue.  This Court has previously held that the expression "my understanding" may denote a lack of knowledge about the question at hand.  *See Sterling Acceptance Corp. v. Tommark, Inc*., 227 F. Supp. 2d 454, 459 (D. Md. 2002) (striking one statement in an affidavit prefaced with the words "my understanding," and holding that those words indicate a lack of personal knowledge).  In this case, however, Barr does not solely preface his answers with the expression "it is my understanding," but also states that his opinions come out of his "experience" or his "belief[s]."  Given that Barr has sixteen years of experience in the embedded software field, it is reasonable to conclude that he has sufficient personal knowledge to support statements about products and brands within the embedded software industry.

QNX's contention that Barr lacks personal knowledge to make the aforementioned statements is also puzzling since it contradicts one of the main arguments Plaintiff makes in its motion for summary judgment.  QNX argues that Barr must have known about QNX's "Neutrino"-brand thirteen years ago when he started his company and therefore adopted the name "Netrino" in bad faith.  Yet, in its Motion to Strike, QNX argues that Barr does not have sufficient personal knowledge at this time to express his opinion about the products and services QNX sells under the "Neutrino"-brand.  Barr cannot have been so familiar with QNX's "Neutrino"-brand when he incorporated his company in 1999 that he adopted the name

"Netrino" in bad faith and now be so unfamiliar with QNX's use of the "Neutrino" mark after over a decade of working the embedded software industry that he cannot express an opinion on the topic.

Second, QNX asserts that Barr's statements as to the sophistication of QNX's customers cannot be based upon Barr's personal knowledge since he has not sold any software. Specifically, QNX takes issue with Barr's statements that:

- "In my experience, purchasers of real time operating systems (including the QNX Neutrino Real Time Operating System) are similarly sophisticated." Barr Decl. ¶ 22.

- "The purchasers of expensive real-time operating systems products, such as the QNX Neutrino RTOS, are also highly sophisticated." *Id.* ¶ 23.

As with the statements QNX objected to above, this Court finds that Barr's significant experience in the embedded software industry is sufficient to establish his knowledge as to the sophistication of the customer base for real time operating systems. Yet again, QNX's contention contradicts its own arguments at summary judgment—that the "parties' customers are identical and overlapping." QNX Summ. J. Mem. at 16. Barr cannot sell Netrino's services to the same customers that QNX sells its "Neutrino"-branded products and yet not be sufficiently knowledgeable as to these customers' level of sophistication.

Finally, QNX argues that Barr's statements regarding the actual and potential confusion of current and future customers must be stricken because Barr has not provided a factual basis for his conclusory statements. Specifically, QNX objects to the following statements:

- "Not once has a single person, corporate entity, or media outlet ever mistakenly assumed Netrino, or any of its employees, contractors, or consultants, have any affiliation with QNX whatsoever... no participant has ever approached Netrino's booth or attended a class taught by myself on behalf of Netrino thinking that QNX was in any way involved with the booth or presentation or that it was about the QNX

Neutrino RTOS.  In the last eleven years, there have been exactly zero instances of confusion between Netrino and Neutrino."  Barr Decl. ¶ 24.

- "Customers have not been, are not, and will not be confused by Netrino and the [sic] Neutrino."  *Id.* ¶ 25.

This Court agrees with Plaintiff that Barr cannot know whether any customer has ever confused or will ever confuse "Netrino" and "Neutrino."  However, this Court interprets Barr's statements to mean only that he is not aware of any consumer that has confused the two marks up to this point, and that as a result Barr believes no consumer will confuse the marks in the future. Anecdotal evidence of consumer confusion has been recognized in numerous trademark cases. *See, e.g., Lone Star Steakhouse & Saloon v. Alpha of Va., Inc.*, 43 F.3d 922, 927 (4th Cir. 1995); *Tools U.S.A. & Equip. v. Champ Frame Straightening Equipment, Inc.*, 87 F.3d 654, 661 (4th Cir. 1996).  Accordingly, this Court denies QNX's Motion to Strike (ECF No. 53).

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c).

When ruling on a motion for summary judgment, a Court must "view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment]

motion,'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alteration in original) (quoting *United States v. Diebold*, 369 U.S. 654, 655 (1962)). If the moving party establishes the absence of a genuine issue of material fact, the opposing party must present evidence in the record demonstrating an issue of fact to be resolved at trial. *Pension Ben. Guar. Corp. v. Beverley*, 404 F.3d 243, 246-47 (4th Cir. 2005) (citing *Pine Ridge Coal Co. v. Local 8377, UMW*, 187 F.3d 415, 422 (4th Cir. 1999)). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine issue of material fact is presented and summary judgment should be denied. *See Anderson*, 477 U.S. at 248. However, the "mere existence of a scintilla of evidence in support of the plaintiff's position" is insufficient to defeat a defendant's motion for summary judgment. *Id*. at 252.

When both parties file motions for summary judgment, as here, the court applies the same standard of review to both motions, with this Court considering "each motion separately on its own merits to determine whether either [side] deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003); *see also havePower, LLC v. Gen. Elec. Co*., 256 F. Supp. 2d 402, 406 (D. Md. 2003) (citing 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2720 (3d ed. 1983).

## ANALYSIS

Plaintiff QNX argues that it is entitled to summary judgment because its "Neutrino" mark is valid and Defendant's use of the "Netrino" mark creates a likelihood of confusion between the two marks. In contrast, Defendant contends that it is entitled to summary judgment because there is no likelihood of confusion with respect to the marks. Defendant also contends that it is entitled to summary judgment because QNX is barred from going forward with this action under

the equitable doctrines of estoppel by laches and acquiescence.  Since Netrino's affirmative

defenses would be dispositive, this Court will address those arguments first.

## I.      Netrino's Affirmative Defenses

### A.      Laches

Netrino contends that QNX's claims are barred by laches because QNX unreasonably

delayed in bringing this action and thereby has unduly prejudiced Defendant.  The defense of

laches is generally available against claims for damages in trademark infringement actions.  *See*

*Brittingham v. Jenkins*, 914 F.2d 447, 455 (4th Cir. 1990).  When determining whether the laches

doctrine applies, this Court must consider:

> 1) Whether the owner of the mark knew of the infringing use;
> 2) Whether the owner's delay in challenging the infringement of the mark was inexcusable or unreasonable; and
> 3) Whether the infringing user would be unduly prejudiced by the owner's delay.

*Brittingham*, 914 F.2d at 456.  If these factors are satisfied, laches typically bars a trademark

owners' claim for monetary damages against an infringer.  *Id*.  Regardless of this analysis,

though, the doctrine of laches does not bar a plaintiff's claim for injunctive relief in a trademark

infringement action.  *Lyons P'ship, L.P. v. Morris Costumes, Inc*., 243 F.3d 789, 797 (4th Cir.

2001).  In fact, this Court has repeatedly recognized that this defense is unavailable to preclude

injunctive relief in a trademark action.  *See, e.g.*, *Holland v. Psychological Assessment Res*., 482

F. Supp. 2d 667, 685 (D. Md. 2007); *World Gym Licensing, Ltd. v. Fitness World, Inc*., 47 F.

Supp. 2d 614, 621 (D. Md. 1999).  QNX seeks only injunctive relief in this action, not damages,

therefore the doctrine of laches does not apply.  Compl. at 4.

Despite the clear authority noted above, Defendant contends that the defense of laches

should still apply because QNX failed to bring this suit until almost twelve years after it first

became aware of Netrino, in 1999.  Netrino emphasizes that it offered to sell the rights to its name to QNX for $4,500 shortly after it was first contacted by QNX, but received no response. As a result, Defendant has continued to do business under the "Netrino" mark and claims that it will be unduly prejudiced if it is enjoined from doing so in the future after "hav[ing] amassed substantial goodwill in its name."  Netrino Summ. J. Mem. 25.  Nevertheless, as the U.S. Court of Appeals for the Fourth Circuit specifically explains in *Lyons*, "[a] prospective injunction is entered only on the basis of current, ongoing conduct that threatens future harm.  Inherently, such conduct cannot be so remote in time as to justify the application of the doctrine of laches." *Lyons*, 243 F.3d at 799.  Accordingly, the defense of laches may not be invoked in this case.

### B.    Acquiescence

Netrino also contends that QNX's action is barred by the doctrine of acquiescence, which bars an infringement action when the trademark owner conveys through "affirmative word or deed" express or implied consent to the infringement.  *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 462 (4th Cir. 1996).  The Fourth Circuit distinguishes between the doctrines of acquiescence and laches by explaining that "acquiescence implies active consent, while laches implies a merely passive consent."  *Id*. at 462-63 (citing 4 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition*, § 31.14[1] (3d ed. 1995)).

Netrino asserts that QNX acquiesced to Netrino's use of its mark by (1) contacting Netrino and revealing its knowledge of Netrino's alleged infringement in 1999, and (2) affirmatively ending settlement negotiations.  Netrino Summ. J. Mem. at 26.  Though QNX affirmatively contacted Netrino about its belief that Defendant was infringing upon QNX's mark, Netrino overstates the facts by claiming that QNX's failure to respond to Netrino's settlement

offer of $4,500 was an affirmative act.  There is no evidence that QNX ever changed its position that Netrino is infringing upon QNX's mark.  Because QNX never affirmatively consented to Netrino's continued use of its mark, the affirmative defense of acquiescence is not applicable to this case.

## II.     Trademark Infringement Claims

QNX moves for summary judgment under the Lanham Act, 15 U.S.C. §§ 1114 & 1125, and under Maryland law, claiming that Defendant's use of the "Netrino" mark infringes upon QNX's use of its "Neutrino" mark and that there is a likelihood of confusion between the parties' marks.  Netrino also moves for summary judgment, claiming that its mark does not infringe upon QNX's mark, and that there is no likelihood of confusion as to the parties' marks.  To establish trademark infringement under the Lanham Act, a "complainant must demonstrate that it has a valid, protectable trademark and that the defendant's use of a colorable imitation of the trademark is likely to cause confusion among consumers." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 930 (4th Cir. 1995).  The test for trademark infringement under state law is the same as the test under the Lanham Act.  *Resorts of Pinehurst, Inc. v. Pinehurst Nat'l Corp.*, 148 F.3d 417, 422 (4th Cir. 1998) (holding that likelihood of confusion is the basic test for both common law and federal trademark infringement).

### A.     QNX Has a Valid, Protectable Trademark

Defendant Netrino does not dispute that QNX has a valid, protectable trademark.  Netrino Summ. J. Mem. at 9.  Since May 27, 1997, QNX has owned a registered trademark for the word "Neutrino," describing "operating system software and manuals relating thereto sold as a unit." Camelon Decl. Ex. 1.  The Trademark Office did not require proof of secondary meaning in

order to register this mark.  *Id.*  Accordingly, QNX's mark is incontestable under the Lanham

Act and is conclusive evidence of QNX's ownership of the mark and the validity of the mark.  15

U.S.C. §§ 1605, 1115(b).

**B.      Likelihood of Confusion**

This Court may grant injunctive relief to the owner of a registered trademark whose

rights have been infringed by another's use of a copy that is "likely to cause confusion, or to

cause mistake, or to deceive."  15 U.S.C. § 1114(1); *Pizzeria Uno Corp. v. Temple*, 747 F.2d

1522, 1527 (4th Cir. 1984).  As the Fourth Circuit has explained, "[t]he ultimate question, for

purposes of determining liability in trademark infringement actions, is whether there exists a

likelihood that an appreciable number of ordinarily prudent purchasers will be misled, or indeed

simply confused, as to the source of the goods in question."  *Perini Corp. v. Perini Constr., Inc.*,

915 F.2d 121, 127 (4th Cir. 1990) (citations and internal quotation marks omitted).

The primary dispute in this case is whether a likelihood of confusion exists.  To ascertain

the likelihood of confusion between two trademarks, the Fourth Circuit has listed seven factors

for this Court to consider:

(1) the distinctiveness of the senior mark;
(2) the similarity of the two marks;
(3) the similarity of the goods or services that the marks identify;
(4) the similarity of the facilities employed by the parties to transact their business;
(5) the similarity of the advertising used by the parties;
(6) the defendant's intent in adopting the same or similar mark; and
(7) actual confusion.

*Pizzeria Uno*, 747 F.2d at 1527.  When appropriate, courts also review the sophistication of the

parties' consumers.  *Sara Lee Corp. v. Kayser-Roth Corp.*, 81 F.3d 455, 463-64 (4th Cir. 1996).

Not all of these factors are of equal importance in every case, nor are they always relevant in any

given case.  *Id.*; *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 320 (4th Cir.

1992) ("the *Pizzeria Uno* factors are only a guide—a catalog of various considerations that may be relevant in determining the ultimate statutory question of likelihood of confusion."). Indeed, the seventh factor—actual confusion— is often the most important factor in the inquiry. *Lyons P'ship*, 243 F.3d at 804 (4th Cir. 2001); *Giant Brands, Inc. v. Giant Eagle, Inc.*, 228 F. Supp. 2d 646, 652 (D. Md. 2002). This Court will address each factor in turn.

## 1) Distinctiveness of the Senior Mark

The first factor this Court must address is the distinctiveness or strength of the senior mark, which in this case is QNX's mark "Neutrino." *Pizzeria Uno*, 747 F.2d at 1527. When determining the strength or distinctiveness of a trademark, this Court must weigh the mark's (1) conceptual strength, namely the relationship between the mark and the services in connection with which it is used; and (2) commercial strength, namely the marketplace recognition of the mark. *World Gym Licensing Ltd. v. Fitness World, Inc.*, 47 F. Supp. 2d 614, 621-22 (D. Md. 1999). The stronger a mark is, the greater the likelihood of confusion. *Synergistic Int'l, LLC v. Korman*, 470 F.3d 162, 171 (4th Cir. 2006).

### a) Conceptual Strength

Conceptual strength is determined by placing the mark on the spectrum of generic, descriptive, suggestive and arbitrary. *Sterling Acceptance Corp. v. Tommark, Inc.*, 227 F. Supp. 2d 454, 461 (D. Md. 2002). This spectrum refers to whether the mark is inherently distinctive or noninherently distinctive. Arbitrary marks are inherently distinctive and thus receive the greatest protection against infringement. *Sara Lee*, 81 F.3d at 463. Arbitrary marks are defined as those that comprise "words, symbols, pictures, etc. that are in common linguistic use but which, when

used with the goods or services issued, neither suggest nor describe any ingredient, quality or characteristic of those goods or services." 2 McCarthy §11:11(4th ed. 2008), p. 11-15.

As an initial matter, the Trademark Office indicated that QNX's mark is conceptually strong by issuing QNX a trademark registration for the mark "Neutrino" without requiring QNX to offer proof of any secondary meaning. *See Synergistic*, 470 F.3d at 172 (finding that by not requiring proof of the secondary meaning of plaintiff's mark the Trademark Office had presumptively determined that the mark was suggestive and therefore valid). The word "Neutrino" has no descriptive connotation in the embedded software industry. It does not describe any attribute or characteristic of QNX's software. Thus, the mark "Neutrino" is arbitrary and therefore inherently distinctive.

To fully address the mark's conceptual strength, this Court must also consider "the frequency of prior use of [a mark] in other marks, particularly in the same field of merchandise or service." *Pizzeria Uno*, 747 F.2d at 1530-31. The more frequently a mark is used in the same field by other companies, the less conceptually strong it is. Defendant argues that the conceptual strength of QNX's mark is undercut by the approximately one dozen trademark applications, including QNX's, which have been filed for marks containing the word "Neutrino." Out of these applications, however, only one is active and relates to the computer industry. This limited third-party use evidence is insufficient to weaken the conceptual strength of QNX's mark. *See, e.g.*, *Moore Business Forms v. Ryu*, 960 F.2d 486,490 (5th Cir. 1992) (single third-party use did not detract from strength of plaintiff's mark); *Am. Mensa, Ltd. V. Inpharmatica Ltd.*, 2008 U.S. Dist. LEXIS 99394, at *16-17 (D. Md. Nov. 6, 2008) (holding that fifteen comparable third-party

marks are insufficient to weaken a plaintiff's mark).  Thus, Neutrino is an arbitrary trademark and therefore conceptually strong.

### b)       Commercial Strength

Whether a mark is commercially strong depends on the degree to which the mark is known to the public.  *Synergistic*, 470 F.3d at 174.  QNX's "Neutrino" mark has been used for approximately thirteen years, during which time QNX has spent millions of dollars advertising goods and services under the mark and received tens of millions of dollars in sales of Neutrino-branded embedded software and services.  Defendant Netrino contends that QNX's position is weakened by the fact that it "nearly always places 'QNX' before 'Neutrino' and 'RTOS' after."  Netrino Summ. J. Mem. at 18.  As will be explained in more detail below, QNX's use of the term "QNX Neutrino RTOS" does not reduce the strength of its "Neutrino" mark.  Under Defendant's logic, Ford Motor Company would not infringe upon Toyota's trademark by selling a Ford "Camry" because Toyota often refers to its product as a "Toyota Camry" or, more analogously, a "Toyota Camry XLE."  A company should not be penalized for associating its name or a description of its product with its trademark.  Thus, this Court finds that QNX's mark is commercially strong.  Accordingly, because Plaintiff's mark is strong, the first *Pizzeria Uno* factor weighs in favor of QNX.

### 2)       Similarity of the Marks

Regarding the second *Pizzeria Uno* factor, this Court must evaluate the similarity of the two marks.  *Pizzeria Uno*, 747 F.2d at 1527.  To find that the marks are similar, the Fourth Circuit holds that the marks "need only be sufficiently similar in appearance, with greater weight given to the dominant or salient portions of the marks."  *Lone Star*, 43 F.3d at 936.  Defendant

Netrino concedes that the marks at issue are "textually similar." Netrino Summ. J. Mem. at 15-16. In fact, the terms "Netrino" and "Neutrino" are more alike than other marks the Fourth Circuit has found to be confusingly similar to each other. For example, in *Communications Satellite Corp. v. Comcet, Inc*., 429 F.2d 1245 (4th Cir. 1970), the Fourth Circuit held that plaintiff's mark "COMSAT" and defendant's mark "COMCET" were confusingly similar because the pronunciations of the marks were "almost identical" and the differences in spelling caused only a "slight" visual difference. *Id*. at 1249. *See also*, *Synergistic*, 470 F.3d at 171 & n. 10 (finding the marks "Glass Doctor" and "Windshield Doctor" confusingly similar); *Sara Lee*, 81 F.3d at 465 (finding the marks "L'eggs" and "Leg Looks" confusingly similar); and *Sweetwater Brewing Co., LLC v. Great Am. Rests., Inc*., 266 F. Supp. 2d 457, 462-63 (E.D. Va. 2003) (finding the marks "Sweetwater Brewing Company" and "Sweetwater Tavern" confusingly similar). In this case, the marks "Netrino" and "Neutrino" are even more similar than those in *Communications Satellite*, as they have almost identical pronunciations and differ in spelling by just one letter.

Though Defendant's mark "Netrino" is confusingly similar to QNX's mark "Neutrino," Defendant argues that the manner in which QNX uses its mark in the marketplace decreases the marks' similarity to each other. Specifically, Defendant contends that the "Neutrino" mark is almost always preceded by the house mark "QNX" and followed by the acronym "RTOS" or its full text "Real Time Operating System." Thus, Defendant Netrino asserts that its mark should not be compared with the mark "Neutrino" on its own but instead with the entire term "QNX Neutrino RTOS."

The Fourth Circuit has held that marks must be compared in terms of their actual use in the marketplace, i.e. in the context in which the marks are seen by the ordinary consumer. *Anheuser-Busch, Inc. v. L & L Wings, Inc.*, 962 F.2d 316, 319 (4th Cir. 1992). The Fourth Circuit also holds, though, that the similarity of two marks is determined by examining the "dominant or salient portions of the marks." *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.,* 43 F.3d 922, 936 (4th Cir. 1995); *see also* 3 McCarthy § 23:42. Thus, "[w]here the 'dominant' portion of the marks is 'sufficiently similar in appearance,' a finding of a likelihood of confusion is appropriate despite the fact that collateral portions of the mark may differ." *Atlas Copco AB v. Atlascopcoiran.com*, 533 F. Supp. 2d 610, 614 (E.D. Va. 2008) (quoting *Lone Star Steakhouse*, 43 F.3d at 936 (affirming injunction against use of name "Lone Star Grill" as an infringement of plaintiff's mark "Lone Star Steakhouse & Saloon")). QNX's trademark demonstrates that the word "Neutrino" is the dominant portion of the mark, as QNX trademarked the term "Neutrino" on its own, not in conjunction with other words. Even assuming the mark "Neutrino" is rarely used on its own but instead is typically referred to as "QNX Neutrino RTOS," the joinder of Plaintiff's mark with its brand name and a generic product name does not lessen the similarity of the marks. As mentioned above, QNX's mark "Neutrino" is sufficiently similar in appearance and pronunciation to Defendant's mark "Netrino." Accordingly, because this Court finds that the marks are similar, the second *Pizzeria Uno* factor weighs in favor of QNX.

### 3) Similarity of the Goods and/or Services

The third factor this Court must analyze when determining the likelihood of confusion between the marks is the similarity of the goods or services at issue. *Pizzeria Uno*, 747 F.2d at

1527.  In other words, this Court must ask whether the goods or services sold under the marks

are "closely related."  *Comcet*, 429 F.2d at 1251.  The products and services at issue are in the

same relatively specialized field, as Plaintiff sells embedded software and Defendant offers

training and consulting services to customers using embedded software.  Furthermore, Defendant

Netrino provides its consulting services to customers using the QNX Neutrino RTOS product,

demonstrating that the parties' products and services are used with one another.

Netrino's primary argument that the goods and services at issue are dissimilar is that

QNX's mark is associated solely with a product, whereas Defendant's mark is linked exclusively

to training and consulting services.[4]  Though Defendant Netrino concedes that "QNX provides

customer service and support for the QNX Neutrino RTOS product," Netrino asserts that these

services are different from the types of services Netrino offers because QNX's services are

"inextricably linked to [QNX's] Neutrino RTOS product," and thus not traditional consulting

services.  Netrino Summ. J. Mem. at 28.  At the very least, it is undisputed that QNX offers

support services for its own software, and that Defendant Netrino also provides support services

for QNX's software.  Though the range of services Netrino provides customers may be far

broader than the support services QNX offers, Defendant's consulting services encompass

Plaintiff's consulting services.  Accordingly, because QNX and Netrino offer similar services,

the third *Pizzeria Uno* factor weighs on favor of QNX.

**4)      Similarity of the Parties' Facilities**

---

[4]  Although QNX does not address this issue, it is worth noting that Netrino's trademark
registrations are for the "design of computer hardware, integrated circuits, communications
hardware and software and computer networks for other," Pennington Decl. Ex. 3, and for the
"design and development of computer hardware and software."  *Id*. Ex. 12.

There appears to be no dispute that the fourth *Pizzeria Uno* factor, the similarity of the facilities used by the parties, is inapplicable to this case. Thus, the fourth *Pizzeria Uno* factor is neutral.

### 5) Similarity of Advertising

The fifth *Pizzeria Uno* factor this Court must address is the similarity of the parties' advertising. *Pizzeria Uno*, 747 F.2d at 1527. In analyzing this factor, this Court should consider the media used, the geographic areas in which advertising occurs, the appearance of the advertisements, and the content of the advertisements. *Id*. at 1535; *Petro Stopping Ctrs., L.P. v. James River Petroleum*, 130 F.3d 88, 95 (4th Cir. 1997). There is no dispute that QNX advertises its products and that Netrino advertises its consulting services over the Internet, through email and at many of the same conferences. The parties have not presented any evidence, however, as to whether the geographic areas in which the parties advertise are the same, or as to the similarity of the appearance or content of the advertisements. Accordingly, this Court cannot make a determination at this time as to whether the fifth *Pizzeria Uno* factor weighs in favor of QNX.

### 6) Defendant Netrino's Intent

The sixth factor this Court must analyze is Defendant's intent in adopting the name "Netrino." *Pizzeria Uno*, 747 F.2d at 1527. Evidence of intent to confuse the buying public is a strong indication that a likelihood of confusion exists since "one intending to profit from another's reputation generally attempts to make his signs, advertisements, etc. to resemble the other's so as deliberately to induce confusion." *Id*. at 1535.

There is no dispute that Barr knew of QNX as a company when he adopted the name "Netrino" in 1996, but the parties disagree as to whether Barr specifically knew of QNX's "Neutrino" brand at that time. Barr states that he first became aware of QNX's use of the "Neutrino" trademark in 1999, when QNX sent him cease and desist letters. Netrino Summ. J. Mem., Barr Decl. ¶ 13. Barr also contends that his good faith adoption of the name "Netrino" is supported by the offer he made to QNX in 1999 to stop using the mark and to sell his Netrino website in exchange for a one-time payment of $4,500. *Id.* Barr asserts that he waited in good faith for four years to hear back from QNX before he filed for a trademark for the "Netrino" mark, and that QNX's silence during this time gave him reason to believe QNX had acquiesced to his use of the mark. QNX insists that, given Barr's substantial experience in the embedded software industry, Barr's claim that he acted in good faith is "not credible based on the undisputed record evidence," as he must have known about the Neutrino operating system QNX was selling when he adopted the "Netrino" mark. QNX Summ. J. Mem. at 13.

QNX has not proven at this stage that Barr acted in bad faith by adopting the name "Netrino." Before making a determination as to this factor, this Court needs more information regarding how well known QNX's "Neutrino" mark was at the time Barr began creating his company in 1996. Accordingly, this Court cannot make a determination at this time as to the sixth *Pizzeria Uno* factor.

**7)      Actual confusion**

Actual confusion is the final and most important *Pizzeria Uno* factor used to determine likelihood of confusion. *Lyons P'ship*, 243 F.3d at 804 (explaining that the "actual confusion factor" is often "paramount" in the likelihood of confusion analysis). Though there is no

requirement that a plaintiff produce evidence of actual confusion, when such proof is present, it is deemed "potent evidence of infringement." *Lone Star*, 43 F.3d at 937. In this case, QNX concedes that it does not have evidence of actual confusion of the parties' products and services, but emphasizes how difficult it is to secure this kind of proof. QNX Summ. J. Mem. at 19. Although QNX does not need to show evidence of actual confusion to prevail on its claim that there is a likelihood of confusion over the parties' marks, the absence of any evidence of actual confusion over a substantial period of time, in this case over approximately ten years, "creates a strong inference that there is no likelihood of confusion." *See CareFirst of Md., Inc. v. First Care, P.C.*, 434 F.3d 263, 269 (4th Cir. 2006). At this time, this factor therefore weighs against QNX.

        **8)      Sophistication of the Parties' Customers**

An additional factor that this Court considers when appropriate is the sophistication of the parties' customers. *Sara Lee Corp*., 81 F.3d at 467. As the Fourth Circuit explains, "[i]f the typical consumer in the relevant market is sophisticated in the use of—or possesses an expertise regarding—a particular product, such sophistication or expertise may be pertinent in determining the likelihood of confusion. *Id*. (citing *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127 (4th Cir. 1990)). As an initial matter, there is no question that QNX offers its software and that Netrino offers its consulting services to many of the same customers, including customers working in the fields of communications systems, medical devices and the military and aerospace industry. Netrino contends that the parties' customers are sophisticated computer engineers and software programmers, and that they take more care than the average customer in "educating themselves about different products and services before making a purchase." Netrino

Summ. J. Mem. at 13.  As a result, Netrino asserts that QNX's and Netrino's customers are unlikely to confuse the two products.

Plaintiff counters that even if their customers are sophisticated, that does not mean they are immune from confusion, or that they engage in lengthy negotiations before signing up for Defendant's "Netrino"-branded training courses.  QNX's argument is undercut, however, by its failure to produce *any* evidence that consumers have confused the parties' products and services. Given that the record is not clear as to the level of sophistication of the parties' customers, their purchasing habits and how this affects their likelihood of confusing the two marks in the future, this Court cannot make a determination as to how this factor affects the overall analysis.

### C.      Summary of Factors

The first three of the *Pizzeria Uno* factors all favor QNX.  First, QNX's mark is distinctive.  The "Neutrino" mark is an arbitrary trademark and therefore conceptually strong. QNX has also spent significant amounts of money advertising its "Neutrino"-branded products to the public for the last thirteen years, therefore the mark is commercially strong.  Second, the "Neutrino" mark and the "Netrino" mark are highly similar because they are almost identical in appearance and pronunciation.  Third, QNX and Netrino sell similar products and services.  At a minimum, both parties satisfy consumer needs in the narrow field of embedded software, and there is no dispute that both QNX and Netrino offer clients support services for the QNX Neutrino RTOS product.

Though only one factor favors Defendant Netrino—the "actual confusion" factor— it is the most important in the analysis.  Based upon the parties' submissions, there is no evidence of any "actual confusion" regarding the "Neutrino" and "Netrino" marks over the last thirteen

years.  This is obviously an important factor for this Court in addressing the question of whether there is any likelihood of confusion in the future.

Furthermore, this Court finds that it cannot make a determination as to three other factors at this time.  As to the fifth factor, the parties have not fully addressed the similarity of their advertising, specifically whether they target similar geographic areas in particular or produce ads with similar content.  As to the sixth factor, Netrino's good faith, the parties must address how well known QNX's "Neutrino" brand was in 1996, when Barr contends he adopted the name "Netrino."  As to the eighth factor, the sophistication of the parties' customers, the parties must provide more information as to QNX's and Netrino's customers' buying habits.  Accordingly, this Court denies both QNX's and Netrino's motions for summary judgment as to the trademark infringement claims.  There are genuine issues of material fact, noted above, which await determination at the trial of this case.

### III.  Unfair Competition Claims

QNX also brings claims against Netrino for unfair competition under the Lanham Act and Maryland law.  Maryland law defines unfair or deceptive trade practices to include "any false, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers." MD. CODE ANN. § 13-301(1). The test for unfair competition under Maryland law is the same as that under the Lanham Act—likelihood of confusion.  *Microsoft Corp. v. Grey Computer*, 910 F. Supp. 1077, 1088 (D. Md. 1995); *Scotch Whisky Association v. Majestic Distilling Company, Inc.,* 958 F.2d 594, 597 (4th Cir. 1992).  Thus, these two claims may be addressed together as the tests under federal and Maryland law are the same.

Because this Court has determined that QNX has not demonstrated there is a likelihood of confusion at this time, this Court denies the parties' motions for summary judgment as to the unfair competition claims.

## CONCLUSION

For the reasons stated above, Plaintiff QNX's Motion to Strike (ECF No. 53) is DENIED, QNX's Motion for Summary Judgment (ECF No. 38) is DENIED, and Defendant Netrino's Cross-Motion for Summary Judgment (ECF No. 47) is DENIED.

A separate Order follows.

Dated:      November 30, 2010      /s/_____

                                        Richard D. Bennett
                                        United States District Judge